# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

|  |  |  |
|---|---|---|
| NELITA MATEO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 10 C 8012 |
| | ) | |
| | ) | Judge Joan H. Lefkow |
| CITY COLLEGES OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION AND ORDER

Plaintiff, Nelita Mateo, filed a four-count complaint alleging race, national origin, and age discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, against defendant, City Colleges of Chicago ("City Colleges").[1]  Presently before the court is City Colleges' motion for summary judgment [dkt. 36].  For the reasons that follow, City Colleges' motion is denied.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and

---

[1]  The court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 and venue is appropriate under 28 U.S.C. § 1391.  Mateo exhausted her administrative remedies and timely filed this lawsuit within 90 days of receiving a notice of right to sue.  *See Conner* v. *Ill. Dep't of Natural Res.*, 413 F.3d 675, 680 (7th Cir. 2005).

affidavits that are part of the record.  Fed. R. Civ. P. 56(c) & advisory committee's notes.  The

party seeking summary judgment bears the initial burden of proving that there is no genuine

issue of material fact.  *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d

265 (1986).  In response, the non-moving party cannot rest on mere pleadings alone but must use

the evidentiary tools listed above to designate specific material facts showing that there is a

genuine issue for trial.  *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir.

2000).  A material fact is one that might affect the outcome of the suit.  *Insolia*, 216 F.3d at

598–99.  Although a bare contention that an issue of fact exists is insufficient to create a factual

dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all

facts in a light most favorable to the non-moving party and draw all reasonable inferences in that

party's favor.  *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d

202 (1986).

## BACKGROUND[2]

### I.    Mateo's Background and Hiring

Mateo is an Asian, of Filipino descent, and originally from the Philippines.  On May 15,

2005, Mateo began working at City Colleges as a full-time, tenure-track instructor in the surgical

technology program at Malcolm X College ("the College") in Chicago, Illinois.  Mateo's work at

the College included serving as an instructor and working as the clinical coordinator of the

surgical technology program.  Prior to joining the College, Mateo worked at John H. Stroger Jr.

---

[2]  The facts in the background section are taken from the parties' Northern District of Illinois
Local Rule 56.1 statements of fact and construed in the light most favorable to Mateo.  Statements of fact
unsupported by admissible evidence will not be considered.  In accordance with its regular practice, the
court has considered the parties' specific objections and responses and has included in this background
section only those portions of the Local Rule 56.1 statements and responses that are appropriately
presented, supported, and relevant to the resolution of this motion.

Hospital of Cook County ("Stroger Hospital") for 15 years in a position as an operating room technician.  At the time of her hire, Mateo was approximately 58 years old.  Mateo resigned from Stroger Hospital to work at the College.

Marietta McDuffy, an African-American who was approximately 48 years old in 2005, was a tenured faculty member and director of surgical technology at the College.  McDuffy recruited Mateo to work at the College.  The two had previously worked together at Rush University Medical Center in Chicago, Illinois.  McDuffy and Mateo were the only full-time faculty members in the surgical technology program working at the College.  In 2005, the faculty at the College had more African-American employees than of any other race.  Mateo was one of the only employees from the Philippines who taught at the College.

## II.     Tenure-Track Faculty Requirements

As a condition of employment with City Colleges, tenure-track faculty had to apply to have their contracts renewed each academic year.  The Board of Trustees authorized the renewal of contracts for non-tenured faculty members.  As part of the tenure process, faculty members submitted a portfolio, which demonstrated their progress toward fulfilling the requirements for tenure.  One of these requirements was to complete a substantial research project or paper "of the quality and state that one would submit for a thesis at the master's level."  Def. L.R. 56.1 ¶ 9 (internal quotation marks omitted).

In addition to the research paper, tenure-track faculty members had to present evidence of their teaching effectiveness, involvement in college activities and responsibilities, and professional growth.  Tenure-track faculty members were required to successfully meet these criteria for three consecutive years, and if their contracts were renewed for a fourth year, these

faculty members were then eligible for tenure. If a tenure-track faculty member's contract was not renewed for the fourth and final year, City Colleges could terminate the faculty member's employment.[3]

Prior to the Board of Trustees' decision on whether to renew a contract, a tenure-track candidate's program director, department chairperson, and dean each made independent recommendations to the College president regarding whether tenure should be granted. In addition, pursuant to a collective bargaining agreement, tenured faculty members also voted whether to grant tenure to a candidate. That recommendation was provided to the president. The president independently evaluated the tenure application and made a written recommendation to the vice chancellor for academic affairs. The chancellor and the Board of Trustees ultimately approved or denied the application. The Board of Trustees was the only body within City Colleges that had the authority to approve applicants for tenure and fire those who were not awarded tenure.

### III.    Mateo's Progress Toward Becoming a Tenured Faculty Member

Mateo was aware of the College's tenure-track requirements upon starting her employment. Mateo started at the College during the 2005-2006 academic year. During that year, she identified her research topic, which was titled "Surgical Technology Program Assessment Tool," the purpose of which was to "enable [the] faculty to test the student several times throughout the two years to evaluate teaching methods and student learning." Def. L.R. 56.1 ¶ 14. McDuffy helped Mateo prepare her first-year portfolio although Mateo did not begin

---

[3] Mateo notes that City Colleges can also retain a faculty member who was denied tenure in a non-tenure position instead of terminating his or her employment.

research on this project during the 2005-2006 academic year. Mateo's project entailed creating a bank of 250 questions to help prepare students for the National Certification Examination ("NCE"), which allowed students who passed the exam to practice in all 50 states as a surgical technologist.

The College renewed Mateo's contract for a second year, which coincided with the 2006-2007 academic term. During her second year of employment, Mateo wrote the abstract, philosophy, introduction, conclusion, and summary of her research paper. After her second year, then-College president Zerrie Campbell, recommended renewal of Mateo's contract, but "with reservation." Def. L.R. 56.1 ¶ 17. Campbell's recommendation stated that Mateo had significant deficiencies in the following areas: professional effectiveness, contributions to the department, contributions to the College, and professional development. In addition, Campbell's recommendation raised issues with the quality and documentation of Mateo's research portfolio. Mateo received a copy of this recommendation.

During her third year, which coincided with the 2007-2008 academic term, Mateo showed her research paper to her department chair, Luc Elie, who was Haitian and approximately 59 to 60 years old at the time. Mateo met with Elie regarding her portfolio, and he reviewed it to make sure that Mateo was on target to submit her final research. Elie told Mateo that she needed to collect data to substantiate her research. Mateo planned to obtain this data from a course she was teaching that term. Elie instructed Mateo to request a one-year extension for her tenure submission so that she could collect sufficient data. Elie wrote a letter to Campbell supporting Mateo's request for an extension. Then vice president of the College,

Ghingo Brooks, who was African-American and approximately 53 to 54 years old at the time, recommended that Mateo be given an extension, as well.[4]

Campbell approved Mateo's request for an extension, finding that the additional time would allow Mateo to test her research portfolio to "identify where improvements are needed in instructional delivery and student learning outcomes" and that the data would ultimately yield "students success and program improvement that will promote high pass rates and student outcomes." Def. L.R. 56.1 ¶ 21. The extension pushed the due date for Mateo's research portfolio back to the fall of 2008.

To collect the data, in the spring of 2008, Mateo offered a voluntary, non-credited review course for students preparing to take the NCE. The students in the review course were graduating in May of 2008 and planned to take the NCE in the summer of 2008. The review course consisted of the students taking previously developed practice tests and then reviewing those results with Mateo. Mateo gathered research on student attendance, average test scores, and the number of questions students answered correctly. Mateo showed the data that she collected during the spring of 2008 to Elie and McDuffy.[5] During the fall of 2008, Mateo taught a credited course titled Surgical Technology 211 ("ST 211"), which was geared toward helping students pass the NCE. Mateo incorporated components of the review course from April of 2008 into ST 211.

_____

[4] Brooks became the interim president and held this position at the time the decision was made not to award Mateo tenure.

[5] Mateo did not incorporate into her research paper the number of students from her course who took the NCE and whether those students passed the exam. Mateo notes that this research needed to be tested before it was include in her final paper.

McDuffy and Alta Williams, an African-, Native-, and Irish-American, who was approximately 38 years old at the time and the director of career programs, observed courses Mateo taught and provided written evaluations. They noted the following areas where Mateo had an "opportunity for growth": incorporating writing into course outlines; giving assignments and holding class discussions that help build critical thinking skills; and sensing the interest/understanding of the group and adjusting pacing accordingly. Def. L.R. 56.1 ¶ 43. Williams gave Mateo the lowest rating in several categories, specifically identifying that Mateo refrain from reading her power point slides verbatim; modify her syllabus; and be clearer and more focused on the goals and purposes of the course. *Id.* ¶ 44. In addition, student evaluations criticized Mateo for being difficult to understand; confusing and unorganized; having a negative attitude; not being open-minded about teaching; and becoming defensive when mistakes were brought to her attention. *Id.* ¶ 46.[6] Mateo, however, received some positive evaluations from other students and faculty members. These evaluations were included in Mateo's final tenure portfolio.

## IV.    Mateo's Tenure Portfolio

In August 2008, before her tenure portfolio was due, the College instructed tenure-track faculty members whose portfolio was due that fall to schedule weekly appointments with their department chair and the dean of career programs to ensure that they had prepared the necessary materials. Mateo never scheduled any meetings during this time with Williams; however, at Williams's behest, the two met twice before Mateo submitted her portfolio. Michael White, who was Mateo's department chair, also attended these meetings. During an October 1, 2008

---

[6] Despite these criticisms, Mateo states that she received glowing reviews from her students.

meeting, Williams told Mateo to keep McDuffy apprised regarding her progress; however, Mateo did not discuss her work with McDuffy, whom Mateo described as uncooperative. White provided feedback to Mateo and corresponded with her via email, describing the areas where her portfolio needed additional work.

On October 9, 2008, White sent Mateo an email stating that her final project needed work. On November 10, Mateo sent White an email on her progress, and he responded by writing back "Excellent!" Pl. L.R. 56.1 ¶ 39.[7] On November 10, 2008, Mateo met with Williams and White to review her tenure portfolio prior to the final submission. Williams memorialized the meeting in a memorandum, writing that Mateo needed to review her data and use the data that existed during the project. The memorandum additionally noted that Mateo needed to provide further details regarding her work teaching the spring and fall 2008 courses.

On November 17, 2008, Mateo submitted her final portfolio. Mateo hypothesized that her review course would help students pass the NCE and would enhance their motivation and preparation for the exam. The parties dispute whether Mateo substantiated her hypothesis with data; the College notes that Mateo failed to collect the necessary data while Mateo states that her hypothesis is supported by data that she collected in the spring and fall of 2008.[8]

On December 9, 2008, Williams emailed Mateo a list of 13 items in her portfolio that were deficient or questionable. Specifically, Williams noted that Mateo lacked data from prior

---

[7] City Colleges notes that White's use of the word "Excellent!" was not commenting on the merits of Mateo's research but, rather, was in response to Mateo's incorporating edits.

[8] City Colleges states that Mateo could not explain how the data she collected supported or refuted her hypothesis. Nor did she include recommendations for improving instructional delivery. Mateo, on the other hand, states that she fully explained her data and made recommendations based thereon.

years and needed to substantiate why she had requested an extension to complete her portfolio.

Williams sent this email at 10:29 a.m. and stated that the changes needed to be made by

2:00 p.m., giving Mateo approximately three and a half hours to incorporate Williams's changes.

Mateo attempted to incorporate Williams's changes; however, the parties dispute whether

Mateo's final submission reflected those edits.

## V.    The Decision to Deny Mateo Tenure

On December 11, 2008, Mateo and another tenure candidate, Ahmed Khan, presented

their tenure projects to the tenured faculty in the career programs department.  While a

presentation to a departmental committee was not required for tenure, each department could

elect whether to hold candidate presentations.  Mateo had been notified on two prior occasions

that she would need to present her tenure project; however, she was not informed of the date and

time of her presentation until the actual day.  The applicants were scored based on their

presentation with 20 points being the top score.

White totaled Mateo's score at 9.25 and sent her an email summarizing the evaluations.

Comments regarding Mateo's presentation included the following: "[D]ata does not support the

thesis . . . [o]utcome nebulous and weak"; "[t]he procedure for collecting the data to support the

thesis was disconnected as well as the results"; and [q]uestionable data, no outcome to

implementation to determine hypothesis . . . [p]roject does not do what is hypothesized."  Def.

L.R. 56.1 ¶ 56.  Mateo also received faculty feedback on her Power Point presentation, which

summarized her results and incorporated the data obtain in support of her research.  Mateo

received a 3.25 out of a possible score of 4 on her Power Point presentation.  This evaluation was

provided to Brooks, who at this time was serving as the interim president of the College.

9

Williams and McDuffy provided separate written recommendations to Brooks. Both independently concluded that Mateo should not be awarded tenure. On October 30, 2008, before Mateo submitted her final portfolio, McDuffy told Mateo that she was not recommending her for tenure. When asked by Mateo why McDuffy was not recommending her, McDuffy allegedly told Mateo that the two did not see "eye to eye." Pl. L.R. 56.1 ¶ 14.[9] McDuffy sent her recommendation later to Brooks on November 9, 2008, again before Mateo submitted her tenure portfolio. While acknowledging that Mateo was an excellent technologist who desired to see the program succeed, McDuffy noted that Mateo wanted to be perceived as the person responsible for any success and wanted to take all the credit for herself. McDuffy noted that Mateo struggled with incorporating technology into her lesson plans.[10] McDuffy stated that Mateo demeaned another employee, Pierre Harges, who was then the clinical coordinator for surgical technology, by telling Harges that he was not a faculty member. Harges is African-American and Puerto Rican and was approximately 36 years old in 2008. McDuffy also provided that Mateo made derogatory comments toward her students and that her research project failed to achieve its desired outcomes.[11]

Williams's recommendation stated that Mateo failed to take advantage of professional development activities to improve her teaching effectiveness and failed to include the necessary

---

[9] McDuffy denied this statement and testified at her deposition that she told Mateo the reasons why she was recommending against tenure; however, McDuffy could not recall at her deposition what reasons she cited.

[10] Mateo, however, notes that McDuffy acknowledged that Mateo completed a program called BlackBoard Blitz, which was geared toward helping Mateo improve her understanding of incorporating technology into the classroom.

[11] Mateo relayed her concern about what McDuffy communicated to Williams, who told her not to worry and to do her best to complete her portfolio.

data to support her research project.  Williams additionally reported that her teaching effectiveness needed improvement and that she made limited contributions to the College.

White provided a written recommendation to Brooks, but he concluded that Mateo should be awarded tenure.  In his letter, White noted how Mateo helped several students perform their clinicals at Stroger Hospital and subsequently obtain employment.  White additionally wrote that "Ms. Mateo has worked to be a valuable asset to the program and college . . .  She is active in job placement . . .  Overall, having worked hard to be a member of the MXC family, Ms. Mateo deserves this recommendation for tenure."  Pl. L.R. 56.1 Ex. R, Dkt. 46–8.  Several representatives from hospitals where Mateo's students performed clinical studies sent letters to the College praising Mateo's work.  Other faculty members wrote letters to Brooks stating that Mateo was a member of the faculty in good standing and was involved in several committees at the College including graduation, recruitment, and assessment committees.  McDuffy also had previously thanked Mateo for serving on the surgical technology advisory board.

Brooks considered these recommendations but decided not to recommend tenure based on his review of Mateo's research project.  Brooks found that Mateo's research project did not include data on passage rates for students taking the NCE.[12]  Nor did Mateo include recommendations for curriculum improvement for an NCE review course.  On February 5, 2009, via letter, Brooks informed Mateo that he was not recommending her for tenure because she failed to complete her research project, tenure portfolio, and other tenure requirements.  The chancellor approved Brooks's recommendation, and on February 13, 2009, the Board of Trustees

---

[12]  Mateo notes that NCE passage rates were not a component of the data that she collected in the spring of 2008.  Additionally, data regarding the NCE passage rate of students whom she taught in the fall of 2008 was not yet available when she submitted her research proposal.  In January 2009, the NCE results showed that the fall 2008 students had a one hundred percent passage rate.

declined to renew Mateo's contract. As a result, on May 16, 2009, Mateo's employment was terminated.

## VI.    Pierre Harges

Mateo alleges that Harges replaced her and was treated more favorably. Harges was hired as a part-time clinical instructor in surgical technology in August of 2007 and became a clinical coordinator in 2008. In 2011, Harges succeeded McDuffy as program director. His title at that time was director of the surgical technology program   Harges does not have and has never applied for tenure. Nor has he been a tenure-track faculty member or a nontenure-track faculty member. Harges mainly taught clinical courses and his duties were administrative. During the summer of 2008, Harges taught a lecture course in surgical technology; Mateo never taught this course. City Colleges later concluded that, because Harges was not qualified to teach a lecture course in surgical technology, having him teach that course was an error. Harges did not teach any other surgical technology courses.

Harges also testified that he did not believe that Mateo was given a fair chance at being considered for tenure. Specifically, Harges heard another faculty member tell McDuffy that "you screwed Mateo and you played a part in her not becoming tenured and you gave her the runaround." Pl. L.R. 56.1 ¶ 3.

## VII.   Alleged Derogatory Comments Made to Mateo During her Employment

### A.    Ghingo Brooks

In late 2008, Mateo gave Brooks a Honey Baked ham, a bottle of wine, and a tie for Christmas. In total, these gifts exceeded more than $100 in value. Brooks, believing that the

12

gifts were inappropriate and uncommon, returned the gifts to Mateo.[13]  Brooks asked Mateo if

giving gifts of this sort was part of her culture.  Brooks allegedly then asked Mateo if she

observed the culture of McDuffy, Harges, and the students.  Brooks then referenced that

McDuffy, Harges, Williams, and Elie were African-American; Mateo replied that she was not

African-American and was from the Philippines.  Brooks asked Mateo, "What can you say about

the environment in Malcolm X College?"  Dkt. 38-2, Mateo Dep. 177–182, 359.[14]  He then asked

Mateo whether she fit it in at the College.  *Id.*

### B.    Marietta McDuffy

On or about September 17, 2008, McDuffy told Harges and Mateo to organize supplies in

a lab by October 1, 2008.  Mateo, without help from Harges, worked on cleaning the lab, which

required putting away several bags and other materials.  Mateo, because of her height, could not

reach some of the seven-foot-high cabinets, and thus could not put everything in the lab away.

McDuffy wrote Mateo up on October 7, 2008 for not completing the task on time.[15]  Mateo

claims that McDuffy told her that she could not complete the task because she was too old.

Mateo states that McDuffy told her, "Why don't you just quit and let the young ones do your

job?"  Dkt. 38–2, Mateo Dep. 128.  Additionally, according to Mateo, at approximately the same

---

[13]  The parties dispute whether this conversation took place in the privacy of Brooks's office or in the foyer outside of his office in front of others.

[14]  City Colleges disputes that Brooks stated that McDuffy, Harges, Williams, and Elie were African-American; rather, it argues that Mateo testified that it was she who identified the race of those employees.  In her deposition, Mateo testified that both she and Brooks identified the race of the other employees during this conversation.

[15]  With the assistance of another employee, Mateo completed organizing the lab on October 16, 2008.

time, McDuffy told Mateo that people had difficulty understanding her because of her accent, stated that she was a troublemaker, and asked why Mateo did not just quit.[16] *Id.* 156, 158.

## ANALYSIS

Mateo alleges that City Colleges denied her tenure and terminated her employment because of her race, national origin, and age. Title VII prohibits employers from discriminating on the basis of race and national origin, *see Porter* v. *City of Chicago*, 700 F.3d 944, 951 (7th Cir. 2012), and the ADEA forbids employers from discriminating on the basis of age. *See Mach* v. *Will Cnty. Sheriff*, 580 F.3d 495, 498 (7th Cir. 2009). Mateo can survive summary judgment on her Title VII and ADEA claims under either the direct or indirect method of proof. *See Porter*, 700 F.3d at 954; *Mach*, 580 F.3d at 498. Mateo relies on both methods of proof.

## I.      The Direct Method

To survive summary judgment under the direct method of proof, Mateo must present direct or circumstantial evidence allowing a jury to infer that the adverse action — the denial of tenure and resulting termination — were motivated by a discriminatory intent. *See Dickerson* v. *Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). Direct evidence requires a statement or admission by a decisionmaker that shows his or her actions were based on a prohibited animus. *See Walker* v. *Bd. of Regents of Univ. of Wis. Sys.*, 410 F.3d 387, 394 n.7 (7th Cir. 2005). Circumstantial evidence is presented as a "convincing mosaic" allowing a jury to infer intentional discrimination by a decisionmaker and may include "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees

---

[16] Mateo states that McDuffy also referred to her as a "Flip" (which is a derogatory name directed toward Filipinos); however, she does not cite to any deposition testimony for support. Accordingly, the court will not consider this statement when ruling on the motion.

in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Silverman* v. *Bd. of Educ. of the City of Chicago*, 637 F.3d 729, 734 (7th Cir. 2011) (internal quotation marks omitted).

### A. Decisionmakers

Mateo argues that Brooks and McDuffy were the relevant decisionmakers and they both made comments to her that underscore that the reason City Colleges denied Mateo tenure and terminated her employment was discriminatory animus. A decisionmaker is the person who makes the decision resulting in an adverse action. *Rogers* v. *City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003). With regard to Brooks, as president of the college, he had a direct role in City Colleges' decision to deny Mateo tenure and terminate her employment. While the ultimate decision rested with the Board of Trustees, Brooks recommended to the Board of Trustees that Mateo not receive tenure, and the Board of Trustees declined to renew her employment contract. Brooks thus can be considered a decisionmaker. *See Adelman-Reyes* v. *St. Xavier Univ.*, 500 F.3d 662, 667 (7th Cir. 2007) ("We accept that a dean's recommendation has significant influence on the tenure process.").

McDuffy, however, had a more attenuated role in connection with City Colleges' decision to deny Mateo tenure and terminate her employment. As a tenured faculty member who served as head of surgical technology, McDuffy made a recommendation to Brooks against awarding tenure. Still, there were additional recommendations and layers of review between McDuffy's recommendation and the Board of Trustees' final decision. *See Willis* v. *Marion Cnty. Auditor's Office*, 118 F.3d 542, 546 (7th Cir. 1997) ("Statements by subordinates normally are not probative of an intent to retaliate by the decisionmaker."). *But see Sun* v. *Bd. of Trs. of*

*the Univ. of Ill.*, 473 F.3d 799, 813 (7th Cir. 2007) ("At the same time, though, the statements of

a person who lacks the final decision-making authority may be probative of intentional

discrimination if that individual exercised a significant degree of influence over the contested

decision.").

Realizing that McDuffy was not the *ultimate* decisionmaker here, Mateo relies on the

cat's paw theory of liability to argue that McDuffy can still be considered a decisionmaker.

Under the cat's paw theory, an employer may be liable for employment discrimination if a

supervisor "performs an act motivated by [discriminatory] animus that is *intended* by the

supervisor to cause an adverse employment action, and . . . that act is a proximate cause of the

ultimate employment action." *Staub* v. *Proctor Hosp.*, --- U.S. ----, 131 S. Ct. 1186, 1194,

179 L. Ed. 2d 144 (2011); *see also Cook* v. *IPC Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012)

("In employment discrimination law the 'cat's paw' metaphor refers to a situation in which an

employee is fired or subjected to some other adverse employment action by a supervisor who

himself has no discriminatory motive, but who has been manipulated by a subordinate who does

have such a motive and intended to bring about the adverse employment action."). McDuffy,

argues Mateo, manipulated Brooks to recommend against tenure because McDuffy harbored a

discriminatory animus toward Mateo.

City Colleges, however, disputes that McDuffy was prejudiced against Mateo and that

McDuffy's recommendation decisively influenced Brooks's decision. City Colleges notes that

McDuffy initially advocated that the College hire Mateo. Both McDuffy and Mateo were over

50 years old at the time of City Colleges' tenure decision, making them a part of the same

protected class under the ADEA. *See* 29 U.S.C. §§ 623(a), 631(a). These factors, argues City

Colleges, demonstrate that McDuffy did not hold a discriminatory animus toward Mateo. In addition, Brooks additionally relied on recommendations from Williams and White in deciding to recommend against awarding Mateo tenure. In arriving at his conclusion, Brooks found that Mateo's research project omitted data on student passage rates for the NCE and additionally failed to make curriculum improvement recommendations. That Brooks considered other recommendations and conducted his own independent review of Mateo's research portfolio belies Mateo's argument that McDuffy's recommendation proximately caused her termination. *See*, *e.g.*, *Long* v. *Teachers' Retirement Sys. of Ill.*, 585 F.3d 344, 351–52 (7th Cir. 2009) ("While [the plaintiff] questions the thoroughness and independence of the [decisionmaker's] investigation, the record shows that [the decisionmaker] was not wholly dependent on a single source of information and reviewed the facts relevant to the decision on his own, which is all that we required to do to absolve [the defendant] of potential liability under the cat's paw theory."). Accordingly, Mateo has failed to substantiate her cat's paw theory that McDuffy influenced Brooks's recommendation against awarding her tenure.

## B. Direct Evidence

Mateo argues that Brooks's statements after Mateo gave him Christmas gifts in 2008 demonstrates direct evidence of discriminatory intent. Namely, Mateo argues that in refusing the gifts, Brooks disparagingly asked if giving expensive gifts was unique to her culture. According to Mateo, Brooks then asked whether Mateo noticed that employees who worked at the College, all of whom were African-American, had different cultural customs than Mateo. Brooks then insinuated that Mateo did not belong at the College based on the cultural difference between her and the other employees. This evidence, however, falls short of constituting direct evidence.

17

Indeed, direct evidence is akin to a smoking gun admission of discrimination.  *See*, *e.g.*, *Hester* v. *Ind. State Dep't of Health*, --- F.3d ----, 2013 WL 4034397, at *3 (7th Cir. Aug. 9, 2013) ("An outright confession of discriminatory intent would suffice, but outside the world of fiction, one does not ordinarily see that kind of evidence.").  Brooks's statements at best are ambiguous.  *See Rudin* v. *Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005) ("'[D]irect evidence would be what [the employer] said or did in the specific employment decision in question.'  For example, evidence that an employer 'said he discharged [the plaintiff] because he is black' constitutes direct evidence."  (quoting *Plair* v. *E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997) (alterations in original)).  In addition, although Brooks made these comments shortly before Mateo's tenure decision, there is no link other than timing connecting these statements to Brooks's eventual decision.  Accordingly, Brooks's comments do not constitute direct evidence of discrimination.  *See Sun*, 473 F.3d at 813 ("We have held that stray remarks that are neither proximate nor related to the employment decision are insufficient to defeat summary judgment."); *Walker*, 410 F.3d at 394 n.7 ("Even isolated comments may constitute direct evidence of discrimination if they are contemporaneous with the discharge or causally related to the discharge decision making process) (internal quotation marks omitted).[17]

---

[17]  Even if it is assumed that McDuffy was a decisionmaker, her statements to Mateo do not meet the demanding standard necessary to show direct evidence of discrimination, although her statements evidenced discriminatory animus to a greater extent than did Brooks's comments.  Mateo argues that McDuffy's telling her that Mateo should quit her job because she was old and because the other faculty members and students had difficulty understanding her are direct evidence of discrimination.  While these statements were made shortly before McDuffy recommended against granting Mateo tenure, they were not in regard to the tenure decision.  Indeed, for a statement to constitute direct evidence of a causal connection, it must "relate to the specific employment decision in question."  *See Randle* v. *LaSalle Telecomms., Inc.*, 876 F.2d 563, 569–70 (7th Cir. 1989).

### C.    Circumstantial Evidence

Mateo additionally argues that the aforementioned statements by Brooks and McDuffy are circumstantial evidence of discrimination in that they demonstrate pretext and would allow a jury to infer discriminatory intent.  The pieces of evidence upon which Mateo relies to construct her convincing mosaic also substantiate her arguments that her claims survive under the indirect method.  Indeed, "circumstantial evidence of pretext offered as part of a direct method claim bears an eerie similarity to the evidence required under the indirect method."  *Kasten* v. *Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 973 n.2 (7th Cir. 2012) (internal quotation marks omitted).  The factors used to prove discrimination under the direct and indirect methods often overlap, and accordingly, the court will consider Mateo's evidence of circumstantial evidence of discrimination *infra* in section II in determining whether her claims pass muster under the indirect method.  *Cf. Coleman* v. *Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring) ("Like a group of Mesopotamian scholars, we work hard to see if a 'convincing mosaic' can be assembled that would point to the equivalent of the blatantly discriminatory statement.  If we move on to the indirect method, we engage in an allemande worthy of the 16th century, carefully executing the first four steps of the dance for the *prima facie* case, shifting over to the partner for the 'articulation' interlude, and then concluding with the examination of evidence of pretext.").

## II.    The Indirect Method

Under the burden-shifting test set forth in *McDonnell-Douglas Corporation* v. *Green*, 411 U.S. 792, 804, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), a plaintiff relying on the indirect method at summary judgment to establish that discrimination resulted in denial of tenure must

19

show that (1) she was a member of a protected class, (2) she was qualified for tenure, (3) she was denied tenure; and (4) an applicant not in the protected class was granted tenure. *See Vanasco* v. *Nat'l-Louis Univ.*, 137 F.3d 962, 965 (7th Cir. 1998); *Namenwirth* v. *Bd. of Regents of Univ. Wis. Sys.*, 769 F.2d 1235, 1240 (7th Cir. 1985). If the plaintiff makes this showing, the burden shifts to the defendant to provide a legitimate nondiscriminatory explanation for the denial of tenure. *Vanasco*, 137 F.3d at 965.[18] The burden then shifts back to the plaintiff who must raise a question of fact regarding whether her denial of tenure was pretextual. *Id*. The first and third prongs of the initial *prima facie* showing are not contested, as Mateo was a member of a protected class under Title VII and the ADEA and was denied tenure.

## A. Qualified for Tenure

Mateo argues that she satisfied the requirements necessary to be awarded tenure. City Colleges, however, contends that Mateo was not qualified for tenure as she failed to satisfactorily complete her tenure portfolio and to comply with City Colleges' other tenure requirements. Namely, Mateo was required to complete a tenure portfolio, which included a research project, evidence of her teaching effectiveness, and professional growth.

Normally, when examining this prong of the *prima facie* test, the court's role is to determine whether an employee has met her employer's good faith employment expectations. *See Robin* v. *Epso Eng'g Corp.*, 200 F.3d 1081, 1090 (7th Cir. 2000). In a denial of tenure case, a qualified candidate must demonstrate not only that she satisfied the objective measures necessary to obtain the promotion, but also that the institution believed that her work warranted a tenured position. *See Nanemwirth*, 769 F.2d at 1242 ("Mere qualification depends on objective

---

[18] Mateo also argues that the denial of tenure precipitated her termination.

measures—the terminal degree, the number of publications, and so on. Tenure requires something more; it requires that the department believe that the candidate have a certain amount of promise."). At base, the institution's reasons for granting or denying tenure must be rooted in a good faith basis and, quite often in employment discrimination cases, this prong of the *prima facie* case blends together with the pretext analysis. *See Sun*, 473 F.3d at 814 (noting that this prong is "inextricably intertwined with the pretext analysis").

City Colleges argues that Mateo continuously failed to meet its expectations for a faculty member on the tenure track. Namely, after her second year at the College, then-president Campbell recommended renewal of Mateo's contract with reservation, identifying numerous deficiencies with Mateo's tenure portfolio, professional effectiveness and development, and contributions to the department and College. During her third year, it also became evident that Mateo lacked the data necessary to test her research, which required a one-year extension before Mateo could submit her tenure portfolio. Even with the additional year, argues City Colleges, Mateo failed to incorporate the data she collected into her final submission. Specifically, her final submission lacked information regarding how many of her students took the NCE and how many of her students passed the examination. This deficiency, City Colleges notes, was glaring in that it was readily accessible to Mateo and was integral to testing her hypothesis, which predicted that her review course would help students pass the NCE. Mateo's final submission also lacked any recommendations on how the College could improve its curriculum to ensure that a higher percentage of students passed the NCE.

City Colleges also noted that Mateo's final tenure portfolio was inadequate both in terms of the research collected and it reflected serious concerns about Mateo's teaching ability. During

the fall of 2008, Williams met with Mateo and critiqued her tenure portfolio; however, Mateo

failed to fully incorporate those changes into her final submission.  Additionally, Mateo's final

submission included evaluations by other faculty members and students who criticized Mateo's

teaching effectiveness.  Mateo's final score of 9.25 out of 20 after she presented her research to

faculty members, notes City Colleges, further underscores the deficiency in Mateo's tenure

proposal.  The totality of these shortcomings, contends City Colleges, provided the Board of

Trustees with numerous and valid bases for which to deny Mateo tenure.  Indeed, both Williams

and McDuffy recommended against awarding Mateo tenure, as did Brooks, after concluding that

Mateo's research lacked necessary data.

Mateo, however, challenges this evidence.  White recommended that Mateo receive

tenure.  In his letter, White referenced how Mateo helped several of her students obtain clinical

positions at Stroger Hospital and that she intervened in helping several of those students obtain

employment.  White also noted, as corroborated by other faculty members, that Mateo served on

several of the College's committees, including the assessment, graduation, and recruitment

committees.  In addition, several representatives from hospitals where Mateo's students

performed clinicals sent letters to the College praising her work.

Mateo also disputes that her final research portfolio failed to incorporate the data that she

collected when teaching courses.  Importantly, notes Mateo, the data ultimately proved her

hypothesis to be correct; one hundred percent of the students who enrolled in her fall 2008

course passed the NCE, substantiating her theory.  Indeed, Mateo also noted that while she only

received a score of 9.25 out of 20 during her presentation of her research to faculty members, she

scored high during her Power Point presentation synthesizing her data (3.25 out of 4.0).

22

Importantly, Mateo also highlights that she was not given adequate time to present her research; she was notified the day of that she would be presenting her research to other faculty members.

Mateo also notes that in addition to her research portfolio allegedly being incomplete, many of City Colleges' reasons for denying her tenure are disputed. Mateo notes that, while some her classroom evaluations were poor, others were positive. While acknowledging that other faculty members including Williams and McDuffy criticized her work, Mateo made a good faith effort to address her shortcomings. As an example, Mateo highlights that she took the BlackBoard review course after her reviews criticized her lack of implementation of technology in the classroom.

While it is not a federal court's role to review a tenure decision *de novo*, *see Namenwirth*, 769 F.2d at 1242, Mateo satisfied her burden to show that she was at least qualified for a tenure position at the College. Notably, White, her department chair, recommended that Mateo receive tenure. Indeed, Mateo has raised enough of a factual question regarding McDuffy's recommendation—which she made *before* Mateo submitted her final proposal—to call the legitimacy of that recommendation into question, leaving Brooks with a choice between one recommendation in favor of tenure and one against. Although Brooks ultimately rejected White's recommendation, that an independent faculty member who reviewed the same portfolio submission and voted for tenure raises factual questions for the jury regarding Mateo's qualifications for tenure.

## B.    Similarly Situated Employees

Mateo contends that Harges was a similarly situated employee outside of her protected class who was treated more favorably and ultimately assumed her responsibilities after her termination.  Harges is an African-American and at the time of Mateo's denial of tenure, he was approximately twenty years younger than she.  City Colleges argues that Harges is not an appropriate comparator because he was not a tenure-track faculty member, a difference that City Colleges contends dooms Mateo's discrimination claims under the indirect method.[19]

The similarly situated employee inquiry, which calls for a "flexible, common sense" approach, asks whether there are "enough common features between the individuals to allow a meaningful comparison."  *Humphries* v. *CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007). In a denial of tenure case, the comparator must also be considered for a tenured position.  *See Vanasco*, 137 F.3d at 965.  In most employment cases, the question whether a similarly situated employee was treated more favorably also touches on the pretext inquiry.  *See Namenwirth*, 769 F.2d at 1240 ("Obviously comparative evidence is relevant in determining whether a motive is pretextual.").

City Colleges argues that Harges is not a comparator for a number of other reasons, as well.  Harges was never on the tenure-track and thus never applied for and was never awarded tenure.  Additionally, Harges was never on the faculty at the College but rather was employed as a part-time clinical instructor in surgical technology.  Although Harges subsequently became the clinical coordinator in 2008 and succeeded McDuffy as program director in 2011, Harges's

---

[19]  Mateo does not use Khan, the other candidate up for tenure at the same time as she, as a comparator.

duties were largely administrative.  Mateo, however, contends that the College allowed Harges to teach clinical courses, although the College later determined that Harges was not qualified to teach certain of these courses.

While most tenure decisions are made on an up-or-out basis, *see, e.g.*, *See Blasdel* v. *Nw. Univ.*, 687 F.3d 813, 818 (7th Cir. 2012), Mateo argues that denial of her tenure did not automatically precipitate her termination and the College could have retained Mateo in a non-tenure role.  Mateo further notes that as director of surgical technology, Harges should have been required to obtain tenure and, if the College kept him in this non-tenured role, it could have also kept Mateo in that position instead of firing her.  Mateo identified several similarities between herself and Harges (*e.g.*, they were both in the surgical technology program at the College and both taught clinical programs) in addition to several important differences (*e.g.*, Harges is African-American, twenty years her junior, retained his employment, and was subsequently promoted).  Nor has City Colleges refuted Mateo's argument that the College could have retained her as a non-tenured faculty member in a similar role to that Harges held.  Although Harges was not an identical comparator because he was not up for tenure, the aforementioned similarities militate in favor of finding that Mateo identified a comparator and thus satisfied her *prima facie* burden.  Accordingly, the burden shifts to City Colleges to offer a legitimate nondiscriminatory explanation for denying Mateo tenure and terminating her employment.

### C.    City Colleges' Legitimate Nondiscriminatory Explanation

City Colleges argues that Mateo failed to meet its exacting standards in awarding tenure to faculty members.  Namely, City Colleges references the fact that Mateo needed an extension to complete her research portfolio to gather additional data, then failed to incorporate that data in

her final submission.  In addition, City Colleges notes that Mateo's reviews in connection with

the classes she taught were substandard and that Mateo failed to make a recommendation about

improving the curriculum for students preparing to take the NCE.  Because tenure represents "a

lifetime commitment" of employment barring exceptional circumstances, *see Blasdel*, 687 F.3d

at 816, institutions of higher learning can require that applicants possess exceptional promise

that distinguish them from the average qualified candidate.  *See Sun*, 473 F.3d at 815 ("This

court has recognized that tenure cases require something more than mere qualification; the

department must believe the candidate has a certain amount of promise."); *Kuhn* v. *Ball State

Univ.*, 78 F.3d 330, 331 (7th Cir. 1996) ("Universities prune the ranks—sometimes ruthlessly, so

that only the best rise.").  City Colleges' articulated reasons for denying Mateo tenure provide a

legitimate nondiscriminatory basis for its decision.

### D.      Pretext

To show pretext, Mateo must demonstrate that City Colleges' reasons for denying her

tenure and terminating her employment were dishonest.  *See Brown* v. *Ill. Dep't of Natural Res.*,

499 F.3d 675, 683 (7th Cir. 2007).  In determining whether an employer's explanation is honest,

courts look to the reasonableness of the explanation.  *See Duncan* v. *Fleetwood Motor Homes of

Ind., Inc.*, 518 F.3d 486, 491–92 (7th Cir. 2008).  In a denial of tenure case, a plaintiff may

demonstrate pretext by showing that the reason is not worthy of belief or that some other motive

explains the university's decision better than the motive offered.  *See Namenwirth*, 769 F.2d at

1240.

Because of the subjective components inherent in making tenure decisions, a plaintiff

faces an uphill fight in showing that she was qualified but denied tenure based on a hidden

discriminatory motive. *See, e.g., Blasdel*, 687 F.3d at 815 ("But although the legal standard is the same whether the plaintiff in an employment discrimination case is a salesman or scientist, practical considerations make a challenge to the denial of tenure at the college or university level an uphill fight—notably the absence of fixed, objective criteria for tenure at that level."); *Farrell* v. *Butler Univ.*, 421 F.3d 609, 616 (7th Cir. 2005) ("We have previously recognized that scholars are in the best position to make highly subjective judgments related with the review of scholarship and university service."); *Sun*, 473 F.3d at 814 ("This is an extremely difficult burden to carry due to the layered and subjective nature of the tenure process, and the courts' recognition that such decisions are based on the fine distinction between competent and superior achievement.") (internal quotation marks and brackets omitted). Still, "Congress did not intend that institutions of higher learning enjoy immunity from the Nation's antidiscrimination statutes." *Vanasco*, 137 F.3d at 968.

City Colleges argues that multiple members of the faculty at the College reviewed Mateo's tenure portfolio and concluded that it did not meet expectations. Specifically, the hypothesis was not supported by data that Mateo should have included as it was at her disposal. Mateo's belief that she was qualified, argues City Colleges, is not enough to warrant a finding of pretext.

Mateo, however, relies on more than her own belief that she was qualified for tenure in arguing that City Colleges' decision was pretextual. In addition to White's recommendation, Mateo notes that she complied with and attempted to incorporate her data and critiques from other faculty members into her final submission. Troubling is the fact that before Mateo submitted her tenure portfolio, on October 30, 2008, McDuffy told her that she had already

decided against recommending Mateo for tenure. The month before McDuffy conveyed her negative tenure appraisal to Mateo, she told Mateo that her students had a difficult time understanding her because of her accent, she was too old to perform her job, and that she should just quit.

City Colleges attempts to downplay the import of these alleged statements arguing that McDuffy recruited Mateo to the College and that McDuffy's recommendation was one of many submitted to the Board of Trustees. First, City Colleges asks the court to apply a "common-actor presumption," which militates against a finding of discrimination when the same person hires and later fires an employee. *See Blasdel*, 687 F.3d at 820 ("When the same person hires and later fires the employee who claims that his firing was discriminatory, judges are skeptical, because why would someone who disliked whites, or Germans, or members of some other group to be working for him have hired such a person in the first place?") (internal quotation marks omitted). Mateo, however, notes that McDuffy may have recruited her to the College, but that the hiring decision was made by then-president Campbell. In any event, the Seventh Circuit has rejected the common actor presumption, and has held that this is just one factor for the trier of fact to consider. *See id.*

Second, City Colleges again notes that the ultimate decision to deny Mateo tenure lay with the Board of Trustees, who made the decision after reviewing an independent recommendation by Brooks, who considered two other recommendations in addition to McDuffy's when deciding against awarding tenure. Indeed, McDuffy was attenuated from the final decision to deny Mateo tenure. But, she still played a role in the decision. McDuffy's

statements to Mateo telling her to quit due to her age and because no one could understand her accent also occurred shortly before McDuffy recommended against awarding Mateo tenure. The nature of these statements and their close proximity to McDuffy's recommendation against tenure raise a factual question regarding whether animus against her age and national origin factored into her decision. *See, e.g.*, *Hunt* v. *City of Markham, Ill.*, 219 F.3d 649, 652–53 (7th Cir. 2000) ("The district court overread language in a number of our cases to the effect that 'stray remarks' of a derogatory character are not evidence of actionable discrimination . . . It is different when the decision makers themselves, or those who provide input into the decision, express such feelings (1) around the time of, and (2) in reference to, the adverse employment action complained of. For then it may be possible to infer that the decision makers were influenced by those feelings in making their decision.") (internal citations omitted).

Moreover, compounding the potential effect of McDuffy's statements were the vague statements made to Mateo in December 2008 by Brooks, who had a direct role in the tenure decision. Mateo testified in her deposition that Brooks asked her to consider the culture of the other teachers and students at the College whom Mateo identified as African-American. Brooks, according to Mateo, then insinuated that she did not belong due to that cultural difference. Brooks testified that his statements were in response to an improper Christmas gift that Mateo gave him; however, Brooks's explanation does not resolve why he made the alleged statements regarding cultural differences between Mateo and the other members of the faculty. While the Seventh Circuit has cautioned against reading into otherwise innocuous statements, *see Blasdell*, 687 F.3d at 819–20, Brooks's alleged statements directly reference Mateo's race and national origin as a distinguishing factor from the rest of the faculty and he made a recommendation to

deny Mateo tenure shortly thereafter. A reasonable jury could find that these statements factored

into the decision to deny her tenure. *See Vanasco*, 137 F.3d at 968 ("Universities should not be

allowed to use the subjective nature of the tenure process to camouflage discrimination.");

*compare with Sun*, 473 F.3d at 815 ("Although some of the defendants' actions early in the

process may have caused [the plaintiff] to lose faith in the fairness and integrity of the

University's tenure and promotion decision, no reasonable jury could find that the final decision

was based on [the plaintiff's] race or national origin.").

City Colleges also argues Mateo merely relies on her own deposition to establish pretext.

The source of the statements made to Mateo by McDuffy and Brooks is also Mateo herself.

Summary judgment, however, is not the mechanism by which to resolve the veracity and

credibility of a witness. *See Hill* v. *Tangherlini*, --- F.3d ----, 2013 WL 3942935, at *2 (7th Cir.

Aug. 1, 2013) ("Deposition testimony, affidavits, responses to interrogatories, and other written

statements by their nature are self-serving. As we have repeatedly emphasized over the past

decade, the term 'selfserving' must not be used to denigrate perfectly admissible evidence

through which a party tries to present its side of the story at summary judgment.") (internal

citation omitted); *Payne* v. *Pauley*, 337 F.3d 767, 771 (7th Cir. 2003) ("[The plaintiff] need not

match [the defendant] witness for witness, or affidavit for affidavit, nor must she persuade the

court that her case is convincing, she need only come forward with appropriate evidence

demonstrating that there is a pending dispute of material fact.") (internal quotation marks

omitted). Accordingly, because Mateo raised an inference that City Colleges' decision to deny

her tenure and terminate her employment were pretextual, she has satisfied her burden under the

indirect method. City Colleges' motion for summary is thus denied.

## CONCLUSION AND ORDER

City Colleges' motion for summary judgment [dkt. 36] is denied. The case will be called for a status hearing on October 10, 2013 at 8:30 a.m. The parties are directed to engage in a sincere effort to settle this case and to report on their progress at the status hearing.

ENTER:

Dated: September 18, 2013

_____
JOAN HUMPHREY LEFKOW
United States District Judge

31